IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JOY A. ALLEN,                          )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )      1:22-cv-603 (LMB/JFA)
                                       )
CHRISTINE WORMUTH, Secretary,          )
   Department of the Army,             )
                                       )
            Defendant.                 )

## MEMORANDUM OPINION

Plaintiff, Joy A. Allen ("plaintiff" or "Allen"), who is proceeding pro se, has filed a four-

count Complaint against Christine Wormuth, the Secretary of the Army ("defendant"), alleging

that defendant denied plaintiff an accommodation to engage in religious practice (Count I),

exposed her to a sexually hostile work environment (Count II), discriminated against her on the

basis of her religion and gender (Count III), and retaliated against her for participating in

protected activity (Count IV), all in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. § 2000e, et seq. Although the Complaint did not include a specific ad damnum,

in her answer to Defendant's First Set of Interrogatories, plaintiff indicated that she was seeking

over twelve million dollars in damages, including $6.7 million for "Emotional Distress, Pain and

Suffering," $1.2 million for "Injury to Professional Standing," and $2.4 million for "Injury to

Character and Reputation."[1]  [Dkt. No. 60-1] at 302.

---

[1] In a later interrogatory response, plaintiff admitted that she had not seen any healthcare
provider, even though she included among her damages requests for "Loss of Health," and
"Impairment of Life or Loss of Enjoyment of Life." Id. at 303–04.

The defendant has filed a Motion for Summary Judgment with a proper <u>Roseboro</u> notice, [Dkt. Nos. 59, 62] to which plaintiff has filed an opposition, as well as a sur-reply. Plaintiff has also filed a Cross-Motion for Summary Judgment. [Dkt. No. 64]. The Court has determined that oral argument would not assist the decisional process, and, for the reasons discussed below, defendant's Motion for Summary Judgment will be granted and plaintiff's Cross-Motion for Summary Judgment will be denied.

## I. BACKGROUND

### A. <u>Standard of Review</u>

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." The movant is entitled to judgment as a matter of law if the movant demonstrates that the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986), and the nonmovant fails to "come forward with 'specific facts showing that there is a genuine issue for trial,'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986) (emphasis omitted).

A genuine dispute about a material fact exists if "after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." <u>Dulaney v. Packaging Corp. of Am.</u>, 673 F.3d 323, 330 (4th Cir. 2012). In making this inquiry, all inferences must be drawn in favor of the nonmoving party. <u>Hawkins v. McMillan</u>, 670 F. App'x 167, 168 (4th Cir. 2016). A party cannot defeat a motion for summary judgment by offering unsupported opinions, conclusions, or "mere allegations." <u>Glynn v. EDO Corp.</u>, 710 F.3d 209, 213 (4th Cir. 2013) (internal quotations and citations omitted). Rather, a party must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "If the adverse party fails to provide evidence establishing that the factfinder could reasonably decide in his favor, then summary judgment shall be entered 'regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law."'" Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). When there are cross-motions for summary judgment, a court "consider[s] and rule[s] upon each party's motion separately and determine[s] whether summary judgment is appropriate as to each." Monumental Paving & Excavating, Inc. v. Pennsylvania Manufacturers' Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999).

## B. Factual Background

Plaintiff takes inconsistent positions as to whether any material facts are in dispute. For example, in her Cross-Motion for Summary Judgment, she states that "there are no genuine disputes of material facts necessitating determination in a trial by jury based on the admissions of the Defendant in [her] own motion for summary judgment," [Dkt. No. 64] at 1, and, in her sur-reply, she states that "the material facts pertaining to the instant matter are almost entirely the same absent several misinterpretations and inferences made with regards to the same." [Dkt. No. 71] at 1.

In contrast, plaintiff asserts in other pleadings that there are "genuine disputes of material fact pertaining to the instant matter," [Dkt. No. 66] at ¶ 82; however, despite claiming that certain facts are in dispute, plaintiff fails to identify any evidence in the record that creates a genuine dispute of the facts presented by the defendant as required by the Local Rules. Local Rule 56(B) requires an opposition to a motion for summary judgment to "include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts

3

alleged to be in dispute." E.D. Va. Loc. Civ. R. 56(B). The consequence of plaintiff's failure to comply with Local Rule 56(B) is that all facts listed by defendant as undisputed material facts may be deemed as admitted by plaintiff. Id.; Brown v. Serenity C & C, Inc., 391 F. Supp. 3d 546, 551–52 (E.D. Va. 2019). Moreover, defendant correctly argues that "plaintiff has mostly concurred" with defendant's summary of the facts by largely copying the defendant's statement of undisputed material facts verbatim in her opposition memorandum, and simply adding statements that are unsupported by the record. [Dkt. No. 69] at 2. Because the plaintiff has failed to comply with Local Rule 56(B), has conceded that there are no genuine disputes of material facts, and has largely adopted defendant's statement of facts, the Court finds that there are no material facts in dispute.

The undisputed material facts establish that, in 2012, plaintiff began working for CACI International, Inc. ("CACI"), a government contractor, and, during that employment, was assigned to work on a contract to support the Army's operations in Afghanistan. [Dkt. No. 60] at ¶ 3. While working in Afghanistan, plaintiff met Shauna Stokes, Ph.D. ("Stokes"), a civilian Army employee. Id. at ¶ 4. It is undisputed that plaintiff believed Stokes disliked her.[2] Id. at ¶ 6.

In April 2015, Stokes transferred to Camp Arifjan in Kuwait where she held a supervisory, logistics-related position as the Force Protection Liaison for the U.S. Army's Program Manager for Electro-Optic Infrared ("EO/IR"), involving responsibility "for integration of all Intelligence, Surveillance, and Reconnaissance ("ISR") multi-sensor and multi-spectral

---

[2] According to plaintiff, Stokes unintentionally left her microphone on during a Zoom call with plaintiff and others, and was overheard saying "something to the effect of, . . . I can't stand Joy, but I don't care because she's a contractor anyway." [Dkt. No. 60] at ¶ 6; [Dkt. No. 60-1] at 46. A mutual acquaintance informed Stokes that plaintiff did not like her. [Dkt. No. 60] at ¶ 6.

persistent surveillance systems" and for "logistic management processes to support movement of those systems for rapid deployment, sustainment, and transportation of equipment for the military forces in that area." [Dkt. No. 60] at ¶ 5. Stokes was responsible for overseeing forty-five (45) contractors, twelve (12) of whom worked directly for Stokes. [Dkt. No. 60] at ¶ 5.

Although plaintiff was aware of Stokes' transfer to Kuwait, she nevertheless asked CACI to reassign her to a contract that would place her at Camp Arifjan in Kuwait. Id. at ¶ 7. In making this request, Allen understood that Stokes would be her direct Army supervisor. Id. Plaintiff claims to have made this decision because Afghanistan was an active combat zone and Kuwait was not. [Dkt. No. 60-1] at 53. In her deposition, Allen admitted she knew that she would be serving as Stokes' "right hand," in the new position, and that, given her belief that Stokes "didn't care for" her, she expected she would need to "cover [her] assets, as they say." [Dkt. No. 60] at ¶ 7–8. Because after her arrival at Camp Arifjan, "plaintiff subjectively believed that Army personnel had begun . . . treating her adversely with respect to her work," Allen created detailed notes about her work in Kuwait. Id. at ¶ 8.

Allen arrived in Kuwait on September 22, 2015. [Dkt. No. 60-1] at 159. Stokes was Allen's immediate Army supervisor, and her second-level Army supervisor was Lieutenant Colonel ("LTC") Robert Smith. [Dkt. No. 60] at ¶ 9. Stokes and LTC Smith reported to LTC Antonio Ralph, who was located in the United States. Id. Allen also was supervised by CACI officials in Afghanistan and the United States. Id.

From September 22, 2015, until she was terminated from her position on November 17, 2025, Allen worked exclusively at Camp Arifjan where her duties involved performing logistics and accountability functions including providing reports about logistics and equipment inventories to ensure that all the "necessary paperwork was in order before the equipment

shipped." [Dkt. No. 60] at ¶ 10(a). On September 29, 2015, four days after Allen arrived at Camp Arifjan, she met with Stokes and LTC Smith who, in addition to explaining Allen's job duties, explained that "everyone in theater was required to work a 12-hour day, six days per week, with one day off, either Saturday or Sunday." [Dkt. No. 60] at ¶ 10; [Dkt. No. 60-1] at 166. Allen initially chose Sunday as her day off to be able to attend Christian church services held from 2:00 to 4:00 p.m. at Camp Arifjan. [Dkt. No. 60] at ¶ 10(b).

One of plaintiff's responsibilities was to create reports that compiled information from multiple Army operations, including activities in countries other than Kuwait. [Dkt. No. 60-1] at 78–79. To create these reports, she needed to receive information from different sources throughout the Army. [Dkt. No. 60-1] at 79. It is undisputed that soon after starting her assignment to Camp Arifjan, plaintiff began having difficulty submitting these reports in a timely manner. [Dkt. No. 60] at ¶ 10. She attributes her late reports to the system developed by Stokes which required her to go through Stokes to get the information rather than gather it herself. Id. In a declaration produced during Allen's administrative proceedings, Stokes stated under penalty of perjury that this system was developed because one third-party contractor required any information it sent to be reviewed by the government before it was released to any other third-party contractors. [Dkt. No. 60-1] at 179.

In early October 2015, Stokes returned to the United States for a pre-planned vacation. [Dkt. No. 60] at ¶ 10. Until Stokes returned to Camp Arifjan on October 21, 2015, LTC Smith was plaintiff's direct Army supervisor. Id. In this role, LTC Smith emailed plaintiff on October 5, 2015 directing her to "join other personnel for an 'additional inventory' of equipment" at Camp Arifjan. Id. at ¶ 11. Rather than complying with that direction, plaintiff questioned whether this request comported with the "logistical duties" identified by Stokes in the September

29 meeting. Id. LTC Smith replied to plaintiff that he believed this would be a "perfect opportunity [for her] to engage with other individuals within the organization," but that if it was plaintiff's "opinion . . . that simply helping out fellow colleagues (regarding initial inventory) [is] not in [her] duty description . . . then by all means, disregard" his direction. Id. at ¶ 11. The record shows that plaintiff did not participate in that inventory. [Dkt. No. 60-1] at 166. According to plaintiff, during this same period, LTC Smith jokingly told her that "he could 'send [her] back to Afghanistan.'" Id. at ¶ 12; [Dkt. No. 60-1] at 76–77. As a result of that comment, plaintiff began to believe that LTC Smith's end goal was to send her back to Afghanistan "or worse." Id. In mid-October, LTC Smith and Tom Toro, another contract employee at Camp Arifjan, met with plaintiff at her request to discuss her continued inability to get information for her reports. [Dkt. No. 60] at ¶ 13; [Dkt. No. 60-1] at 80–81. Plaintiff believed, after the meeting, that "certain measures were taken to make it appear as [though they were] working with her . . . and doing things to help her," but these improvements did not last. Id.

On October 21, 2015, Stokes returned to Camp Arifjan, and LTC Smith updated her on issues he had faced with plaintiff while Stokes was away. [Dkt. No. 60] at ¶ 14. Specifically, LTC Smith told Stokes that Allen questioned his direction to conduct inventory with other coworkers, that she changed her assigned day off from Sunday to Saturday, and that she did not work a full twelve-hour shift on Sunday, October 18, 2015. According to LTC Smith, on October 18, 2015, Allen appeared for work at 9:00 a.m., left to attend church services from 2:00 to 4:00 p.m., and then returned to the office shortly before leaving at 5:00 p.m. Id.

In response, Stokes emailed Allen on October 26, 2015 to address the issue LTC Smith had raised about plaintiff's attendance, writing

> the contracting staff works a 6 day work week from 0700 to 1900 [7:00 a.m. to 7:00 p.m.] and you can take either Saturday or Sunday off. If you plan to attend worship

7

> services I would like you to take off Sunday and attend.  I do not want you to come
> in on Sunday and leave for church services, just use Sunday as your off day as
> oppose[d] to being off on Saturday.

[Dkt. No. 60] at ¶ 15.  In her deposition, plaintiff explained that she wanted to take off Saturdays,

rather than Sundays, to avoid having contact with Stokes, stating

> the reason why I didn't want to take Sunday off is because the work environment
> that was already created for me [at] that point in time, was already hostile,
> difficult, I was being alienated, . . . and Dr. Stokes was at the root of it.  So Dr.
> Stokes normally took off Sunday.  She took off Sunday, so I took off Saturday,
> that way I would at least have [a] . . . two-day break from my interaction with Dr.
> Stokes.

[Dkt. No. 60] at ¶ 16; [Dkt. No. 60-1] at 92–93.

In the evening on October 26, 2015, Allen emailed Stokes to tell her that she had a

medical appointment the next morning.  [Dkt. No. 60] at ¶ 17.[3]  Plaintiff was supposed to submit

a "necessary report" to the leadership at Camp Arifjan on October 27, 2015; however, because

her medical appointment took longer than she anticipated, plaintiff did not submit the report on

time.  Id. at ¶ 17, 17(a).  More significantly, plaintiff never directly communicated to her Army

supervisors in Kuwait that her report would be late due to her appointment.  Id. at ¶ 17(a).

Instead, she sent a note to her CACI leadership in Afghanistan explaining the delay.  Id. at

¶ 17(b).  Only when Stokes texted Allen did Allen communicate to anyone in Kuwait that she

would not be at work on time and that she would be submitting her report late.  Id. at ¶ 17(a).

After this incident, LTC Smith sent an email to Allen's CACI leadership in Afghanistan to share

his frustration with her communication about running late, saying that her choice "to reach out

---

[3] Allen claims that this appointment was required to get a visa to live in Kuwait, and that
individuals generally only receive notice of when it will be scheduled "a week or two" before the
appointment.  [Dkt. No. 60-1] at 107–08.  Plaintiff claims that she advised Stokes about the
appointment as soon as she knew when it was scheduled.  Id.

directly to Afghanistan[] show[ed] a complete lack of commitment to the individuals within the Kuwait footprint in which she is currently working." Id. at ¶ 17(b).

The record shows that plaintiff attended church services on Sunday, November 8, 2015, even though she had not taken this Sunday as her day off from work. [Dkt. No. 60-1] at 115, 159, 300. Allen claims that Stokes gave her oral permission to attend church services "on [her] lunch break," which Stokes disputes. [Dkt. No. 60] at ¶ 15 n.3; [Dkt. No. 60-1] at 99. In her First Set of Interrogatories, defendant asked plaintiff to identify all instances in which plaintiff contended to have engaged in "protected activity," as defined by Title VII. [Dkt. No. 60-1] at 300. Plaintiff's only answer referred to her "attending church on November 8 during [her] lunch break."[4] Id.

On November 11, 2015, plaintiff had an incident with a foreign national maintenance worker, who was employed by a different contractor, after she asked him for help moving boxes in her office. [Dkt. No. 60] at ¶ 19. At one point while passing a box between them, plaintiff said that the worker's hand brushed up against her breast, "which [she] thought was an accident," at the time. [Dkt. No. 60-1] at 118; [Dkt. No. 60] at ¶ 19 n.4. After they finished moving the boxes, the worker shook plaintiff's hand for what seemed like a prolonged period, which plaintiff took to mean "he was expecting a tip for assisting" her. [Dkt. No. 60-1] at 118. When she handed the man the tip, he shook her hand, and, "rubbed his finger down the center of [plaintiff's] hand," stuck out his tongue, and "wiggl[ed] it up and down in a lewd manner." [Dkt.

---

[4] The parties dispute whether Stokes gave plaintiff permission to use her lunch break to attend religious services, [Dkt. No. 60] at ¶ 13 n.3; [Dkt. No. 60-1] at 99; however, it is uncontested that staff were allotted only one hour for lunch and church services lasted close to an hour and a half. [Dkt. No. 60-1] at 117. As a result, it would not have been possible for plaintiff to attend a church service during her lunch hour without exceeding the allotted hour, and by choosing to work on Sundays, plaintiff created a direct conflict with her work schedule.

No. 60] at ¶ 19; [Dkt. No. 60-1] at 118. Plaintiff screamed, and the man quickly apologized and tried to return plaintiff's tip. [Dkt. No. 60] at ¶ 19.

Plaintiff informed Stokes and LTC Smith about this incident on the same day, November 11, 2015. [Dkt. No. 60] at ¶ 20; [Dkt. No. 60-1] at 120–21. In response, LTC Smith solicited a written statement about the event from Allen and provided this statement to Major John Forte, the Deputy Director of Operations for Public Works projects at Camp Arifjan, who then discussed the incident with the maintenance worker's company, Vectrus. Id. at ¶ 20(a). Vectrus representatives indicated to Major Forte that the company would provide more oversight over its employees. Id. Additionally, Stokes contacted William Reed, the Deputy Program Manager for EO/IR, who suggested that she contact the Sexual Harassment/Assault Response and Prevention ("SHARP") Program Office located within Camp Arifjan. Id. at ¶ 20(b). Both Stokes and LTC Smith contacted SHARP, but they were told that, because the incident involved two contractor employees, SHARP could not address it. Id. Plaintiff testified that she did not believe her employer, CACI, did anything upon learning about the incident from plaintiff. [Dkt. No. 60-1] at 132.

Allen worked in her assigned office at Camp Arifjan for the next three full workdays without encountering the maintenance worker; however, on Monday, November 16, 2015, he came to her office to conduct maintenance work. [Dkt. No. 60] at ¶ 21; [Dkt. No. 60-1] at 121–23. When she saw him, Allen went to her car and called Stokes to tell her about the encounter. [Dkt. No. 60] at ¶ 22; [Dkt. No. 60-1] at 124. Stokes permitted her to work from home for the rest of the day. Id. The next day, November 17, 2015, plaintiff stayed in her car when she arrived at work and saw the maintenance worker preparing to enter her office building. [Dkt. No. 60] at ¶ 23. Upon seeing him, plaintiff immediately left to work somewhere other than her

office building without communicating this to Stokes. Id. When Stokes discovered Allen was not in her office, she emailed Allen to ask where she was, and Allen told her for the first time that she was working at another location in Camp Arifjan. Id.; see also [Dkt. No. 60-1] at 232–37. Stokes offered to find plaintiff another place to work in the same building as her office, but plaintiff declined, saying that she did not want to be in the same building as the maintenance worker. Id. Plaintiff did not return to her office building that day. [Dkt. No. 60] at ¶ 23.

After Allen refused to return to her assigned building on November 17, 2015, Stokes communicated the issues she had been having with plaintiff to LTC Antonio Ralph, the head of EO/IR, and Stokes and Smith's supervisor. [Dkt. No. 60] at ¶ 9, 24. LTC Ralph decided to ask CACI to remove plaintiff from the Camp Arifjan contract. Id. at ¶ 25. As a result, CACI notified plaintiff on November 17, 2015 that she was being removed from the contract. Id. Plaintiff continued to use Camp Arifjan's facilities, including her government-issued vehicle. Id. at ¶ 26; [Dkt. No. 60-1] at 239. On November 20, 2015, LTC Smith requested that plaintiff's access card to the base be revoked. Id. at ¶ 26. After plaintiff was terminated from the contract, she downloaded the emails to which she had access before her departure from Camp Arifjan, including emails that contained PowerPoints and Excel spreadsheets with information about military equipment. [Dkt. No. 60-1] at 26. Plaintiff admits that she did not request permission to take any of these emails or their contents with her when she left Kuwait. Id. From November 17, 2015—when she was removed from the Camp Arifjan contract—until May 31, 2016, Allen claims to have remained a CACI employee who was able to seek placement on other CACI contracts, but she was not selected to work on another CACI contract during that period. [Dkt. No. 60] at ¶ 27.

After her removal from the Army contract, plaintiff began to look for new jobs and was offered a new position as a contractor with a company called VT Group around February 22, 2016. [Dkt. No. 1] at ¶ 17–18; [Dkt. No. 60-1] at 137–38. Plaintiff claims that after she was offered the position, which was located at Camp Arifjan, Stokes shared information with an employee from the VT Group about plaintiff. [Dkt. No. 60-1] at 139, 273–74. Plaintiff claims that this information "ultimately . . . led to [her] job offer being rescinded." Id. at 139–40. According to a VT Group employee who worked across the hall from Stokes, after he told Stokes that the VT Group was hiring Allen to fill a position, Stokes emailed him[5] a message "stating the [plaintiff] had been removed from the base," [Dkt. No. 60-1] at 273–74, and, according to plaintiff, shared with him the memorandum which was used to revoke her access to the base, [Dkt. No. 60-1] at 139; [Dkt. No. 60-1] at 239.

### C. Procedural History

Plaintiff filed an administrative complaint with the Army,[6] alleging that the defendant discriminated and retaliated against her based on her gender and religion, and that the defendant created a hostile work environment during her time at Camp Arifjan. [Dkt. No. 60] at ¶ 28; [Dkt. No. 60-1] at 255–259. Plaintiff received a Final Agency Decision ("FAD") on April 30, 2019, denying her claims. [Dkt. No. 60-1] at 261, 276. On October 1, 2020, the Office of Federal Operations ("OFO") within the EEOC affirmed the agency's final decision, which found that plaintiff was not subject to discrimination during her time at Camp Arifjan. [Dkt. No. 60-1] at

---

[5] Although the Final Agency Decision ("FAD") from the EEO erroneously stated that this email was sent on February 24, 2017, the record reflects that it was sent sometime between February 22, 2016 and February 24, 2016. [Dkt. No. 1] at ¶ 17–18;  [Dkt. No. 60-1] at 262–63, 274.

[6] Because of jurisdictional defects in plaintiff's filings, although she contacted a Los Angeles Equal Employment Opportunity Commission ("EEOC") office on December 18, 2015, her complaint was not deemed filed and received in the proper EEO office until May 9, 2017. [Dkt. No. 60-1] at 255.

276, 281.  The OFO advised plaintiff that she had ninety (90) days in which to file a civil action. [Dkt. No. 60-1] at 288.

On December 22, 2020, proceeding pro se, plaintiff timely filed her Complaint in the United States District Court for the Middle District of Tennessee.  [Dkt. No. 1].  The Complaint was transferred to the Eastern District of Virginia on May 25, 2022 after defendant filed a Motion to Transfer Venue to More Appropriate Forum and for Partial Dismissal.[7]  [Dkt. No. 21].

## II. DISCUSSION

**D.  Analysis**

As a threshold matter, the parties do not dispute that, for Title VII purposes, plaintiff was at all times an employee of both CACI and the Army.  See King v. Dalton, 895 F. Supp. 831, 834 (E.D. Va. 1995) ("[A]n aggrieved employee, in appropriate circumstances, can have more than one employer under [Title VII]"); Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404, 409 (4th Cir. 2015) ("We now hold that the joint employment doctrine is the law of this Circuit.").

1.      Failure to Provide Religious Accommodation

Plaintiff argues that Stokes failed to provide her with a religious accommodation by not permitting her to take her day off on Saturdays and to attend church on Sundays during her lunch break.  As the defendant correctly argues, this is a meritless claim.

Title VII prohibits discrimination by an employer on the basis of religion.  42 U.S.C. §§ 2000e-16(a), 2000e(j).  To establish a prima facie religious accommodation claim in the Fourth Circuit, a plaintiff must produce evidence showing "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of

---

[7] The Middle District of Tennessee denied defendant's Motion insofar as it requested partial dismissal, and therefore transferred plaintiff's entire Complaint to the Eastern District of Virginia.  [Dkt. No. 33] at 4.

this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." U.S. Equal Employment Opportunity Comm'n v. Consol Energy, Inc., 860 F.3d 131, 141 (4th Cir. 2017); E.E.O.C. v. Firestone Fibers & Textiles Co., 515 F.3d 307, 312 (4th Cir. 2008).

Plaintiff has failed to establish a prima facie case that the Army failed to accommodate her religion because she has not alleged that her bona fide religious belief conflicted with an employment requirement. The record shows that plaintiff was not required to work on Sundays, but, by choosing to do so, she created her own scheduling conflict with church services. Stokes did not create a conflict between plaintiff's religious beliefs and a work requirement when she emailed plaintiff that she would prefer her to take Sundays as her day off if she wanted to attend church. As plaintiff admitted in her deposition, by this request, Stokes never directed plaintiff to work during church services. [Dkt. No. 60-1] at 83 ("[Mr. Barghaan:] Did Dr. Stokes ever prohibit you from attending church services? [Ms. Allen:] No."). As plaintiff also admitted in her deposition, she was supposed to only take a one-hour lunch break, and church services lasted one and a half hours. [Dkt. No. 60-1] at 117. Given the required work schedule, plaintiff would always have a problem attending services if she worked on Sundays.[8]  Plaintiff also admitted in her deposition that the true reason she wanted to take Saturdays off, rather than Sundays was to avoid Stokes: "I took off Saturday, that way I would at least have [a] . . . two-day break from my interaction with Dr. Stokes." [Dkt. No. 60-1] at 92–93. Because plaintiff chose Saturdays as her day off—not for a religious reason, but, to have more time away from Stokes—plaintiff

---

[8] In an email on October 28, 2015, plaintiff told Stokes that she "may want to take Saturdays off or alternate between Saturday and Sunday[]." Id. In her declaration produced during plaintiff's administrative proceedings, Stokes said that she "explained to [Allen] that [Stokes] could not allow her to alternate her days off because [Stokes] would have to offer the same to everyone else on the team." [Dkt. No. 60-1] at 173.

manufactured the conflict between her work schedule and her religious observance, and has not

established a conflict between a religious belief and an employment requirement.  As defendant

correctly emphasizes, plaintiff's "problem was one of scheduling," and her desire to spend less

time at work around Stokes.  [Dkt. No. 60] at 15.  As such, she has not made a prima facie case

of a failure by defendant to accommodate her religious practice, and for this reason, summary

judgment will be granted for defendant as to plaintiff's religious accommodation claim.

      2.    <u>Hostile Work Environment</u>

      Plaintiff has also failed to prove she suffered a hostile work environment based on the

incident with the maintenance worker and her supervisors' response to it.  To establish a claim

for a hostile work environment under Title VII, a plaintiff must present evidence that, if "viewed

in her favor, would allow a reasonable jury to conclude that the harassment was (1) unwelcome,

(2) based on [plaintiff's] gender, . . . (3) sufficiently severe or pervasive to alter the conditions of

her employment and create an abusive atmosphere, and (4) imputable to [her employer]."

<u>Freeman v. Dal-Tile Corp.</u>, 750 F.3d 413, 420 (4th Cir. 2014).  Defendant has assumed for the

purposes of her Motion for Summary Judgment that plaintiff could satisfy the first two elements,

and the Court will assume so as well, [Dkt. No. 60] at 16; however, defendant correctly argues

that Allen has failed to point to evidence that the alleged harassment was "severe or pervasive,"

and that it can be imputed to the Army.

      Proving that harassment was sufficiently severe or pervasive is a "high bar" that can only

be met if a plaintiff establishes that the work environment was not "merely unpleasant," but

"deeply repugnant."  <u>EEOC v. Sunbelt Rentals, Inc.</u>, 521 F.3d 306, 315 (4th Cir. 2008); <u>Hopkins</u>

<u>v. Baltimore Gas & Elec. Co.</u>, 77 F.3d 745, 753 (4th Cir. 1996), <u>abrogated on other grounds by</u>

<u>Bostock v. Clayton County</u>, 140 S. Ct. 1731, 1742 (2020).  When assessing whether conduct

creates a hostile work environment, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  The Supreme Court has held that "isolated incidences (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

Plaintiff has described one isolated incident, which, although clearly troubling to her, was not so "extremely serious" that it could establish a hostile work environment.  As courts have found, a single act of inappropriate or unwelcome touching does not constitute "extremely serious" conduct. Coleman v. Pentagon Fed. Credit Union, 2017 WL 1044693, at *3–*5 (E.D. Va. Mar. 17, 2017); Burke v. CHS Middle E., LLC, 2019 WL 459022, at *5 (E.D. Va. Feb. 4, 2019).  Because plaintiff has described only an isolated incident of inappropriate touching, she has not established that the conduct she experienced was severe and pervasive.

Even if the incident plaintiff experienced was severe and pervasive gender-based harassment, defendant correctly argues that the maintenance worker's conduct cannot be imputed to the Army.  To hold the Army liable for the maintenance worker's conduct, plaintiff must establish that the Army "knew, or should have known, about the harassment and failed to take effective action to stop it . . . [by] respond[ing] with remedial action reasonably calculated to end the harassment." Pryor v. United Air Lines, Inc., 791 F.3d 488, 498 (4th Cir. 2015) (citing EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 319 (4th Cir. 2008)) (applying this standard to "hostile work environments created by co-workers and third parties").  There is absolutely no evidence in the record that the Army had any knowledge of any misconduct by the maintenance

worker until Allen reported her encounter; therefore, there was no action that the Army could have taken to prevent it from happening.

Moreover, once advised of the incident, the defendant took action to remedy it by alerting the maintenance worker's employer and affording plaintiff the ability to change offices to avoid any further contact with the individual. [Dkt. No. 60] at ¶ 20, 22–23. Given the maintenance worker's status as a contractor, LTC Smith and Stokes took reasonable steps to address his conduct by raising it with the contracting company and with the Army's own SHARP Office. Although Plaintiff wanted to move into a different building to avoid another encounter with the maintenance worker, and although she was not immediately offered this choice by her supervisors, [Dkt. No. 60-1] at 128–29, an employer who does not provide an employee with the exact remedy she seeks does not act unreasonably. The proper evaluation is whether the employer took "steps that were . . . reasonably calculated to end" the harassment. Bazemore v. Best Buy, 957 F.3d 195, 202 (4th Cir. 2020). Stokes permitted plaintiff to work remotely for one day and, the next day, offered to find her another location in which to work, albeit in the same building. Whether plaintiff wanted the Army to take different measures, LTC Smith and Stokes' actions were reasonably intended to prevent future harassment towards plaintiff. Because the maintenance worker's conduct was not sufficiently severe or pervasive and cannot be imputed to the Army, and the Army took reasonable steps to prevent any future harassment, the Court will grant summary judgment to defendant as to plaintiff's hostile work environment claim.

3.   Discrimination

Plaintiff claims that defendant discriminated against her on the basis of gender and religion in violation of Title VII when LTC Ralph asked CACI to remove her from the Army contract, and when Stokes informed a potential employer about the circumstances of plaintiff's

removal from the Army contract.  When bringing a claim for employment discrimination without direct evidence, a plaintiff must use the burden shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973).  First, the plaintiff must establish a prima facie case by showing "(1) [s]he belongs to a protected class; (2) [s]he suffered an adverse [personnel] action; (3) at the time of the adverse [personnel] action, [s]he was performing h[er] job at a level that met h[er] employer's legitimate expectations"; and (4) the adverse personnel action occurred under "circumstances [that gave] rise to an inference of unlawful discrimination."  Adams v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 558 (4th Cir. 2011) (citing Taylor v. Va. Union Univ., 193 F.3d 219, 230 (4th Cir. 1999)).  If a plaintiff makes a prima facie case of discrimination, the burden shifts to the defendant to proffer a "legitimate, nondiscriminatory reason for the adverse [personnel] action."  Id. (citing Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc)).  If the employer meets this burden, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination."  Id. at 558–59.

Plaintiff has failed to establish a prima facie case of discrimination based on either her gender or religion.  As defendant correctly argues, "plaintiff is certainly a member of a protected class" as a Christian woman.  [Dkt. No. 60] at 21.  The Court also agrees with defendant that plaintiff has established that an adverse personnel action[9] was taken against her when she was

---

[9] As defendant highlights, this Court has recognized that "the United States Supreme Court has recently signaled that the federal-sector term 'personnel action' should be interpreted more broadly than its private-sector counterpart 'employment action.'"  Abdelhamid v. Sec'y of the Navy, 525 F. Supp. 3d 671, 684 (E.D. Va. 2021).  The Court agrees with the defendant that the distinction between the two terms here is "largely academic," as plaintiff's termination from the Army contract would constitute both an adverse employment action and an adverse personnel action.  [Dkt. No. 60] at 22.

removed from the Army contract.[10] [Dkt. No. 60] at 23. But plaintiff has failed to establish that she was meeting the Army's legitimate expectations at the time of her removal and that she was removed from the contract under circumstances that would give rise to an inference of discrimination.

Whether Allen was meeting the Army's legitimate expectations at the time she was removed from the contract is measured from the perspective of the Army, not plaintiff's own "self-assessment." See Freeman v. Sci. Applications Int'l Corp., 2020 WL 6928610, at *5 (E.D. Va. Nov. 24, 2020), aff'd, 2022 WL 17103716 (4th Cir. Nov. 22, 2022) (quoting Arthur v. Pet Dairy, 593 F. App'x 211, 217 (4th Cir. 2015)). The record contains overwhelming, undisputed evidence that Stokes and LTC Smith determined that plaintiff was not meeting their legitimate expectations. For example, plaintiff initially questioned Smith's directive to perform duties she believed to be outside of her job description. [Dkt. No. 60] at ¶ 11. She did not communicate to her immediate Army superiors that she would be submitting a "necessary report," late, id. at ¶ 17, 17(a), she was often late in submitting reports, id. at ¶ 10, and she disobeyed Stokes' direction to work in her assigned office building after her experience with the maintenance worker, id. at ¶ 23. The facts establish that plaintiff has not met her burden to establish she was meeting the Army's expectations.

---

[10] Plaintiff also appears to claim that Stokes' communicating information about her to the VT Group constitutes an adverse personnel action. [Dkt. No. 1] at ¶ 43; [Dkt. No. 60] at 23; however, nothing in the record suggests that this communication contained any false information. Because communicating truthful information in a reference to a prospective employer does not amount to a materially adverse action for purposes of a Title VII retaliation claim, see Mascone v. Am. Physical Soc'y, Inc., 404 Fed. Appx. 762, 765 (4th Cir. 2010), which is a "less stringent" standard than an adverse personnel action, Westmoreland v. Prince George's Cnty., Md., 2010 WL 3369169, at *8 (D. Md. Aug. 23, 2010), Stokes' communication to the VT Group does not constitute an adverse personnel action.

Additionally, plaintiff has not established that her removal from the contract took place under circumstances that would give rise to an inference of gender or religious discrimination. As plaintiff admitted in her deposition, she believed that she was removed not because of discriminatory animus, but because of Stokes' personal animus towards her. [Dkt. No. 60-1] at 145. Specifically, she believed she was removed from the Army contract because she did not "think Dr. Stokes ever really cared for [her] and just included Lt. Col. Smith in this agenda." Id.

Not only did plaintiff subjectively believe she was removed from the contract for a reason other than gender or religious discrimination, the record does not otherwise contain evidence of circumstances that could give rise to an inference of discriminatory termination. There is no evidence that LTC Ralph, the individual who ultimately asked CACI to remove plaintiff from the Army contract, harbored any discriminatory motive in doing so. Even if the removal could be attributed to reports from Stokes, her membership in the same protected classes as plaintiff— being a Christian woman—weakens any inference that she was motivated by discriminatory animus. See Orgain v. City of Salisbury, Md., 305 Fed. Appx. 90, 103 (4th Cir. 2008).

If Allen had established that a similarly situated contractor who was either not Christian or not a woman had engaged in similar behavior and was treated differently, she could have created an inference of discrimination. Gary v. Facebook, Inc., 822 Fed. Appx. 175, 180 (4th Cir. 2020); Haywood v. Locke, 387 Fed. Appx. 355, 359 (4th Cir. 2010). Not only does plaintiff fail to identify any similarly situated comparators,[11] but the record identifies a male, Protestant

---

[11] The record reflects that plaintiff identified one comparator, Curtis Ashley, to support her claim of religious discrimination. In a declaration produced during plaintiff's administrative proceedings, Stokes responded to Allen's allegation that Ashley was provided a religious accommodation by being allowed to attend worship services on his lunch break by explaining that, unlike Allen, Ashley chose Sundays as his day off and therefore could take as much time as he wanted to attend services. [Dkt. No. 60-1] at 181. Plaintiff has not rebutted this explanation that shows Ashley was not a comparator.

CACI contractor removed by Stokes for similar reasons as plaintiff. [Dkt. No. 60-1] at 188. Because plaintiff has failed to show she was meeting the Army's legitimate expectations, and because she has failed to establish any inference of gender or religious discrimination, she has failed to establish a prima facie case of discrimination.

Even if plaintiff had established a prima facie case, she has failed to show that the Army's legitimate, nondiscriminatory reasons were pretextual. Defendant has proffered that plaintiff was terminated from the Army contract because of her documented performance issues. [Dkt. No. 60] at ¶ 24; [Dkt. No. 60-1] at 174, 177, 188, 197. At this stage of the McDonnell Douglas framework, defendant's burden "is one of production, not persuasion," Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 514 (4th Cir. 2006), and defendant has produced sufficient record evidence to show that the Army believed that plaintiff was not meeting its legitimate expectations.

To establish that defendant's proffered reason for discharge was pretextual, plaintiff must establish by a preponderance of the evidence that she was removed for discriminatory reasons. Lettieri v. Equant Inc., 478 F.3d 640, 646 (4th Cir. 2007). Although plaintiff disputes that the criticisms of her performance are accurate, "when an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not [the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'" Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000). Plaintiff has not pointed to any record evidence to support her claim that defendant's reasons for removing her from the contract were pretextual. Moreover, she explicitly admits that she believed she was removed because of personal animosity harbored by Stokes. [Dkt. No. 60-1] at 145. Although "[p]ersonal animosity untethered to actual protected class animus simply does not

21

violate Title VII," [Dkt. No. 60] at 26, the record shows that personal animus was not the reason for Allen's removal from the contract. Instead, the record shows that genuine problems with plaintiff's performance led LTC Ralph to ask CACI to remove plaintiff from the Army contract. [Dkt. No. 60] at ¶ 24–25. Because the record contains no evidence that plaintiff's removal from the contract was in any way based on her gender or her religion, and because she has admitted in her testimony that she believed her removal was due to Stokes' personal animus towards her, summary judgment will be granted for defendant as to plaintiff's discrimination claim.

  4. Retaliation

  For similar reasons, plaintiff has failed to establish a claim for retaliation. Courts apply the McDonnell Douglas framework when determining if a plaintiff has established a Title VII retaliation claim in the absence of direct evidence of retaliation. Strothers v. City of Laurel, Maryland, 895 F.3d 317, 327 (4th Cir. 2018). A plaintiff can establish a prima facie case of retaliation by showing that: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted [materially] adverse action." Id. (quoting Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008)). The action by the employer must be "materially adverse" to the plaintiff, meaning "any action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Laurent-Workman v. Wormuth, 54 F.4th 201, 216 (4th Cir. 2022). If the prima facie case is made, the employer has the burden to show that the materially adverse action was "the result of a legitimate non-retaliatory reason." Strothers, 895 F.3d at 328. Finally, to prevail, the plaintiff has the burden to rebut this evidence and show that the employer's proffered non-retaliatory reasons were not its true reasons for the materially adverse action, but were a pretext for retaliation." Id.

To establish she engaged in protected activity, a plaintiff can show "she oppose[d] 'not only . . . employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful.'" Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 282 (4th Cir. 2015) (quoting EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005)).  A plaintiff must "subjectively in good faith believe[]" that an employment practice is unlawful, and this belief must be "objectively reasonable in light of the facts." Cuffee v. Tidewater Cmty. Coll., 409 F. Supp. 2d 709, 720 (E.D. Va. 2006), aff'd, 194 Fed. Appx. 127 (4th Cir. 2006) (citing Peters v. Jenney, 327 F.3d 307, 320–21 (4th Cir. 2003)).

Plaintiff first argues that she engaged in protected activity when she attended church on an extended lunch break while working on Sunday, November 8, 2015, after Stokes asked her not to do so.[12]  [Dkt. No. 60-1] at 300.  Defendant construes this to more broadly encompass plaintiff's request to use Saturdays as her day off and take time out of the work day on Sundays to attend church, even after Stokes had asked her to take Sundays as her day off if she wanted to attend church.  [Dkt. No. 60] at 28.  Plaintiff also claims that she engaged in protected activity when she worked outside of her assigned office building and refused to return to that building after the incident with the maintenance worker.[13]  [Dkt. No. 69] at 9.

---

[12] Plaintiff makes this argument even though she contends that, by this date, Stokes had granted her permission to attend church on an extended lunch break.  [Dkt. No. 60] at ¶ 15 n.3; [Dkt. No. 60-1] at 99.

[13] Defendant argues that this latter allegation is procedurally deficient because when plaintiff responded to defendant's interrogatory question asking for all the instances of protected activity in which she engaged, she only mentioned attending church.  [Dkt. No. 60-1] at 300.  Plaintiff first identified requesting to move offices as constituting a protected activity in her opposition memorandum to defendant's Motion for Summary Judgment.  [Dkt. No. 66] at ¶ 79.  Even though this is an improper way to raise such an issue, given plaintiff's pro se status, the Court has considered it.

As defendant correctly argues, neither of these actions constitute protected activity. First, plaintiff did not engage in protected activity by either requesting to take Saturdays off and attend church during the workday on Sundays or by attending church on November 8, 2015. A plaintiff's opposition to an employment practice only constitutes protected activity when she subjectively believes she is opposing unlawful behavior and when this belief is objectively reasonable. Cuffee, 409 F. Supp. 2d at 720. Plaintiff has not met this standard. As to attending church services on November 8, 2015, Allen maintains that Stokes had given her permission to attend church on Sundays even when she took off Saturdays, meaning she could not subjectively believe she was opposing any unlawful employment practice by attending church on November 8, 2015. [Dkt. No. 60] at ¶ 15 n.3; [Dkt. No. 60-1] at 99. Even construing plaintiff's protected activity claim more broadly as her request to attend church on Sundays and take Saturdays off, it was objectively unreasonable for plaintiff to believe that Stokes' expressing a preference for plaintiff to take off Sundays if she wanted to attend church services was unlawful. As discussed above, at no point did plaintiff's bona fide religious belief conflict with a requirement of her employment. Plaintiff's choice to take Saturdays off—which was, by her own admission, not for religious reasons but to avoid Stokes—created an artificial conflict between plaintiff's religious beliefs and her employment requirements, and defeats any claim that plaintiff's attending church on Sunday constituted opposition to an unlawful employment practice. Lastly, it is significant that plaintiff admitted in her deposition that defendant never denied her the ability to attend church services.

Plaintiff also claims that working in an office building other than her assigned building even after Stokes offered to find her a new place to work within her assigned building constituted protected activity. Determining whether an "opposition activity" is protected requires a court to

engage in a balancing test, weighing the "purpose of [Title VII] to protect persons engaging in reasonable activities opposing discrimination . . . against Congress' desire not to prevent employers from legitimately disciplining their employees." Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 257 (4th Cir. 1998) (citing Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981)). "Title VII was 'not intended to immunize insubordinate, disruptive, or nonproductive behavior at work.'" Id. at 260 (quoting Armstrong, 647 F.2d at 448). The uncontested evidence shows that plaintiff decided to work in a different office building without first asking Stokes for permission. As a result, Stokes had to seek her out after Stokes realized plaintiff was not working in her assigned building, and plaintiff subsequently refused Stokes' offer to relocate her within her assigned building. [Dkt. No. 60] at ¶ 23; [Dkt. No. 60-1] at 232–37. Stokes' contemporaneous emails to plaintiff documented her concern that plaintiff had inconvenienced those whose workspace she was using on November 17, 2015. [Dkt. No. 60-1] at 232. When Allen responded that she was not inconveniencing other staff, Stokes replied that "[i]f you are an inconvenience or not that is not your DUTY LOCATION. You will NOT work at . . . any other site . . . when I have provided an alternate work area for you where you will not see the men working in the building." Id. (emphasis in original). Plaintiff still refused to work in her assigned building after this directive. The Army undoubtedly has an interest in maintaining the chain of command by having staff members respond to directives from their supervisors. Plaintiff's failure on November 17, 2015 to communicate to Stokes that she would be away from her assigned workspace and her refusal to work in a location provided by Stokes does not constitute protected activity.

Although plaintiff's request to attend services on Sundays while working and her choice to work in an unassigned office building do not constitute protected activity, the defendant has

25

conceded that plaintiff engaged in protected activity when she reported the incident with the maintenance worker to Stokes and LTC Smith, even though plaintiff does not clearly argue that this action constituted a protected activity. Accepting that plaintiff has established that she engaged in protected activity by reporting her experience with the maintenance worker, she must next establish that she faced a materially adverse action as a result of making that report. The defendant concedes that plaintiff's removal from the Army contract constitutes a materially adverse action, just as it constitutes an adverse personnel action.

Given that she has established the first two elements of a prima facie case of retaliation, plaintiff has also established a causal connection between reporting the incident with the maintenance worker and her removal from the Army contract based on the short time span—six days—between the protected activity and her removal from the contract. Emami v. Bolden, 241 F. Supp. 3d 673, 681 (E.D. Va. 2017); Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011). Although the Fourth Circuit has found that periods of three to four months are too long to establish a causal connection by temporal proximity alone, Pascual v. Lowe's Home Centers, Inc., 193 Fed. Appx. 229, 233 (4th Cir. 2006); Roberts v. Glenn Indus. Group, Inc., 998 F.3d 111, 127 (4th Cir. 2021), it has acknowledged that a shorter time period could establish this causal connection for purposes of the prima facie case, Silva v. Bowie State Univ., 172 Fed. Appx. 476, 478 (4th Cir. 2006). The six day period between plaintiff's protected activity, reporting the November 11, 2015 incident, and her removal from the Army contract on November 17, 2015 is sufficient to create an inference of a causal connection for plaintiff's prima facie case of retaliation without other evidence to show causation.

As previously discussed, however, the defendant has produced legitimate, non-retaliatory reasons concerning plaintiff's performance justifying her removal from the contract. See

26

Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000); [Dkt. No. 60] at ¶ 24; [Dkt. No. 60-1] at 174, 177, 188, 197.  In her declaration made under penalty of perjury during administrative proceedings, Stokes explained that Allen was removed from the contract because "if asked to do something[,] it became a debate[,] . . . she refused to conduct onsite inventories of equipment, she refused to work alongside the other team members, her whereabouts had been in question on several occasions, and she would never comply with the set work hours."  [Dkt. No. 60-1] at 188.

Because defendant has proffered legitimate non-retaliatory reasons for plaintiff's removal from the contract, to prevail on her claim, plaintiff must show that her protected activity was the "but for" cause of the materially adverse action, which she has not done.  Staley v. Gruenberg, 575 Fed. Appx. 153, 155 (4th Cir. 2014).  Although temporal proximity alone may establish causation at the prima facie stage, it cannot, without additional record evidence, satisfy the more "onerous" burden that plaintiff's protected activity was the "but for" cause of her removal from the contract.  Hoyle, 650 F.3d at 337 (quoting Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir.1989)); Staley, 575 Fed. Appx. at 156.  Plaintiff has not offered any evidence, other than the close, six-day window between her protected activity and her removal from the contract, to show that the defendant's proffered reasons were pretextual, and has therefore not rebutted defendant's legitimate reasons for her removal.  Moreover, the record shows that, within those six days, plaintiff continued to engage in some of the same behavior with which her supervisors had expressed concern before, namely, not communicating with her supervisor and going outside the chain of command.  Because plaintiff has failed to establish that her protected activity was the "but for" cause of her removal from the Army contract and has not presented evidence of pretext, she has failed to meet her burden to prove her Title VII retaliation claim as to her removal from the Army contract.

27

In addition, Plaintiff has failed to establish a prima facie case of retaliation as to Stokes' communication with the VT Group. The record does not reflect that Stokes communicated any untruthful information to the VT Group; instead, plaintiff admits that Stokes shared with the VT Group "the memorandum that was used to get [her] base access revoked." [Dkt. No. 60-1] at 139. Plaintiff also admits that her base access was revoked, and she has not cited to any evidence to show that the memorandum shared by Stokes contained false information. Sharing truthful information, even if negative, does not constitute a materially adverse action. See Mascone v. Am. Physical Soc'y, Inc., 404 Fed. Appx. 762, 765 (4th Cir. 2010).

Even if plaintiff had sufficiently established that Stokes' communication was a materially adverse action, the time period of more than three months between plaintiff's protected activity and Stokes' sharing information with the VT Group undercuts the required causal connection. Roberts, 998 F.3d at 127 ("[Plaintiff's] termination—three months after his last report of harassment—did not 'closely follow' a protected activity, and thus does not present a circumstance that courts have characterized as creating a strong inference of retaliation."). Because plaintiff fails to establish a prima facie case for retaliation as to Stokes' communication with the VT Group, she has failed to prove this Title VII retaliation claim.

### III. CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment [Dkt. No. 59] will be GRANTED and plaintiff's Cross-Motion for Summary Judgment [Dkt. No. 64] will be DENIED by an Order to be issued with this Memorandum Opinion.

Entered this 2ND day of February, 2023.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

28